**Harry BANKS, an infant By BANKS his Mother and Natural Guardian, Ella Banks and Ella Banks individually, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 95 Civ. 9227(BN).

United States District Court,
S.D. New York.

July 8, 1997.

---

Finkelstein, Levine, Gittelsohn & Tetenbaum, Newburgh, NY (Elliot S. Tetenbaum, of counsel), for Plaintiffs.

Mary Jo White, United States Attorney for the Southern District of New York, New York City (Sheila M. Gowan, Marianne T. O'Toole, Assistant United States Attorneys), for Defendant.

## OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge.[1]

Ella and Harry Banks ("plaintiffs") bring this negligence action against the United States of America ("defendants") as a result of an accident occurring on United States Post Office property. Specifically, Harry Banks asserts that after he was invited onto post office property by a postal employee; that the employee negligently closed a gate which severed the tips of the ring and middle fingers of Harry Banks' right hand. Additionally, Ella Banks, Harry's mother, seeks recovery against defendant for the alleged current and future loss of services of plaintiff.

Conversely, defendant maintains that no duty of care was violated, that the injuries were not proximately caused by a negligent act on its part; and that Harry had no permission to be on post office property. Moreover, defendant argues that should it be found to have acted negligently, plaintiffs' own negligence contributed to causing the injuries to Harry. Finally, defendant asserts that Harry was aware of and voluntarily assumed the risks of riding on the gate.

The matter arises under the Federal Torts Claims Act and the court's jurisdiction is predicated upon 28 U.S.C. § 1346(b). Pursuant to the order of the court, the liability phase of this case was bifurcated as to any subsequent damages phase. *See* Order dated January 26, 1996 (Stanton, J.). Thus, the only issue presented to the court at this juncture is the liability of defendant for the claims alleged within the complaint. The case was tried to the court in a four day bench trial. In conformity with F.R.C.P. Rule 52(a), the following constitutes the court's findings of fact and conclusions of law with respect to liability.

## THE RECORD

In its direct case, plaintiffs presented seven witnesses: Douglas Ingram, custodian for the United States Post Office's Newburgh Office during August 1993, Joseph Lee, police officer for the city of Newburg; Harry Banks, infant plaintiff in this action, Oscar Banks, Harry's brother[2], Steven Burch, custodian for the United States Post Office's Newburgh Office during August 1993, James A Cole, neighbor of the Banks family during the summer of 1993, and Dr. Joan Roessler,

---

1. Bernard Newman, Senior Judge of the United States Court of International Trade, sitting as United States District Judge by designation.

2. At the request of defendant, prior to allowing Oscar and Harry Banks to testify, the court conducted an inquiry in order to determine whether they would be permitted to testify. After separately asking Oscar and Harry numerous questions, including their understanding of telling the truth, the court found both Oscar and Harry competent to testify (R. 78–80; 342–345). Fed. R.Evid. 601. The inquiry was conducted in the presence of both defendant's and plaintiffs' counsel and no objection was raised to the court's decision to allow Harry and Oscar to testify.

an expert regarding children's learning disabilities.

Defendant presented seven witnesses: Frederick Sohr, safety specialist for the United States Post Office, Louis Banks, Harry's father, Ella Banks, co–plaintiff and mother of Harry, Laura Ciancio, Supervisor of Customer Service at the Newburg Post Office in 1993; Desiree Abbruscato, Postal Clerk at the Newburg Post Office; Gregory K. Tutelian, Postal Inspector for the United States Postal Service; Jacquelyn Walker, Supervisor of Customer Service at the Newburg Post Office.

The parties moved 31 exhibits into evidence.

## CONTENTIONS OF THE PARTIES

Plaintiffs contend that on August 21, 1993, Harry Banks, along with his brother Oscar, was invited onto postal property by post office custodian Steven Burch to ride the gate while Burch was closing it. At the time, Harry was approximately 8 and one–half years old and Oscar was seven and one–half years old. Maintaining that inviting the children onto the property was Burch's usual course of conduct, plaintiffs claim that Harry and Oscar were allowed to climb up on the fence and ride it while Burch pushed it to a close. According to plaintiffs, at some point while Burch was pushing the gate closed, Harry's hand was caught under a roller and the tips of his right ring and middle fingers were cut off.

Although plaintiffs concede that at other times different postal employees had told Harry that he was not permitted on postal property, plaintiffs suggest that such restrictions were negated by Burch and other employees who often invited Harry and Oscar to the parking area of the post office where they would let them play and give them food. Plaintiffs also argue that because Harry is learning disabled, such mixed signals did not make him aware that he was not permitted to play on postal property.

Plaintiffs conclude that because Burch allowed Harry to ride the gate at the time of the accident, the United States Postal Service negligently caused Harry's injury. Specifically they contend that Harry was not fully cognizant of the dangers he faced while playing on the fence and believed that he was permitted to ride on the gate while Burch closed it. Therefore, plaintiff states that Harry did not assume the risks of playing on the fence. Moreover, asserting that Burch invited Harry to ride the gate, plaintiffs reason that Harry was not comparatively negligent. Thus, plaintiffs conclude that defendant was guilty of negligence and liable to Harry for damages sustained, as well as, damages to Ella Banks for the loss of Harry's services.

Defendant responds that Burch acted with reasonable care and was not negligent. In making this claim, defendant denies that Burch invited Harry and Oscar to ride the gate. In fact, defendant claims that Burch had warned the children to stay away from the gate and observed them walking away from the gate when he began to close the gate. According to defendant, Harry and Oscar climbed on the fence while Burch's back was turned and that is when Harry subsequently was hurt. Defendant points out that Harry had been repeatedly warned by postal employees that he was not permitted to play on postal property and that he was even punished by his parents for playing on the postal property. Alternatively, defendant opines that even if negligence is found, Harry contributed to his own injury. Finally, defendant argues that Ella Banks is precluded from recovering on her derivative claim because she failed to act reasonably in the care of Harry prior to the accident.

## FINDINGS OF FACT

On August 21, 1993, Harry Banks was 8 years, 7 months, and 3 weeks old. During the summer of 1993, Harry Banks lived with his parents and brother at 77 Chambers Street in Newburg, New York. Across from his house, located at 217 Liberty Street, is a United States Post Office. The rear of the post office, which includes a loading dock area and a parking lot, faces the Banks' house on Chambers Street. The loading area is surrounded by a perimeter chain link fence with large openings secured by gates which roll closed. The fence measures 7 feet

5 inches in height and is opened and closed by sliding the gate along metal rollers which are affixed to metal posts.

Prior to the accident, there is no disagreement that Harry Banks was often found on the post office property. There is a dispute of fact as to whether the post office, through its employees, invited Harry onto the property. While plaintiffs maintain that postal employee Steven Burch often invited Harry onto the premises and allowed him to ride the gate, defendant contends that postal employees told Harry on several instances that he was not allowed on postal property. In resolving this dispute of fact, the court finds that Harry was often invited onto postal property. This finding is supported by the testimony of postal employees, neighbors, and Harry himself. There is no doubt that several of the postal employees did order Harry to leave the area on a number of occasions, however, this does not change the fact that other workers permitted Harry to play on postal property—as allegedly was the situation at the time of the accident.

Perhaps the most compelling testimony on this issue was proffered by Douglas Ingram, a custodian at the Post Office. Ingram stated that during the summer of 1993, he often saw Harry and other children playing on post office property. Harry and the other children were climbing on fences, rolling carts down slopes on the hill, and playing ball. In fact, Ingram told the court that on several occasions Harry climbed on the gate when Ingram was about to close it. Ingram explained that because of these occurrences he was on the lookout for children playing on the gate before he closed it. Additionally, Ingram saw Harry and his brother Oscar climbing on the gate in the presence of other postal employees. While Ingram explained to the court that he usually told Harry that he should not be playing on the postal property, there were times that Ingram said nothing. Of particular note is the fact that Ingram testified that on numerous occasions he saw the Banks children on postal property with Steven Burch. Indeed, Burch gave the boys food and rubber bands while they were in the loading area.

The court finds Ingram entirely credible. His testimony was straightforward and believable. Thus, while he may have told the Banks children to leave postal property, the evidence demonstrates that other employees would sometimes remain silent and, at least in the case of Burch, welcome the children by giving them small gifts and food. It is clear from Ingram's testimony that Burch, at least on some occasions, welcomed Harry and Oscar onto the postal property.

Against the backdrop of Ingram's testimony, the court also considers the evidence offered by James Cole, a former neighbor of the Banks family. Cole told the court that he often observed Harry and Oscar playing on the postal property, and that on quite a few occasions Burch had waved to the children to come over. While there, the boys would sometimes talk to Burch or ride the gate while Burch closed it. Cole testified that he never heard Burch tell the children they couldn't stay on postal property. In fact, Cole explained that he would sometimes tell Harry and Oscar not to play on the post office property, but they did not listen to him because Burch would tell them that it was permissible.

Defendant challenges the credibility of Cole. Specifically, defendant implies that because Ella Banks and Cole's wife are friends, Cole is not worthy of belief Additionally, defendant points out that there are some inconsistencies in Cole's testimony as to whether he saw Louis Banks, Harry's father, outside the house. Nonetheless, the court finds Cole's testimony to be worthy of belief.

Initially, the court had a full opportunity to observe Cole during direct and cross examination. Hence, while Cole was subjected to a rigorous cross–examination by defense counsel, he never seemed to waiver with respect to the heart of his testimony. Moreover, when taken in conjunction with Ingram's testimony, it is entirely believable that Burch would have frequently summoned the children onto the postal property. By Ingram's account, Burch would talk with the boys, give them food, and give them small gifts. Ingram likewise testified that he observed the boys riding the gate on many occasions. It certainly follows that Burch would also tell

them that they could play in and around the loading dock.

More, defendant's assertion of bias on Cole's part is nothing more than speculation. The court finds that Cole answered each question as best as he could, was forthright, and entirely credible. The "inconsistencies" pointed to by defendant are trivial and not noteworthy.[3] Further, defendant unpersuasively implies that because Cole's wife is a friend of Ella Banks, Cole would lie to the court in his testimony. The court will not presume that simply because the wife of a witness is the friend of a plaintiff, that the witness will fabricate testimony thereby exposing himself to the penalties of perjury. Moreover, the Coles and the Banks are no longer neighbors. Nor is there any evidence to suggest that Cole and Ella Banks colluded with respect to Cole's testimony. Indeed, while Cole testified that he observed Burch call the boys over to the post office, Ella Banks testified that she never saw Burch invite the boys. Additionally, Cole is not financially interested in this matter, nor was there any showing that he had any particular animosity against the postal service. The short of the matter is that the court finds Cole to be credible and rejects defendant's assertions to the contrary. Hence, the court finds that Burch had a history of inviting Harry Banks onto postal property.

The next source of material disagreement is the mental state of Harry Banks. Plaintiff maintains that Harry, who was eight years old at the time of the accident, was learning disabled, did not appreciate any risks posed by riding on the gate, and was further confused by "mixed signals" given by postal employees. In support of this contention, plaintiffs rely upon the testimony of Dr. Joan Roessler, an expert in the area of children's learning disabilities. Dr. Roessler testified that after personally examining Harry, interviewing his parents, and examining his school records, she is of the opinion that Harry has a long history of learning disabilities which impair his cognitive functions, ability to think logically and in the abstract, and think ahead. Within this framework, Dr. Roessler opined that Harry, after being told not to go onto postal property while at the same time being invited onto postal property received mixed signals. As a result of these mixed signals, Dr. Roessler concludes that there is no reason why Harry would not play on postal property.

Defendant does not contest the fact that Harry is suffering from learning disabilities but argues that Harry is more functional than Dr. Roessler suggests. Initially, defendant questions the methodology of Dr. Roessler's conclusions. While conceding that Harry did poorly on some of the Wechsler sub–test administered to him, Harry also scored in the average range on other sub–tests. Moreover, defendant argues that Harry's own testimony evidences that he is "an able young man." Defendant's Memorandum of Law, p. 35. Consequently, Harry testified that he understood how the gate worked, that he had been told by many people including his parents that he was not to play on postal property, and that he had been punished for previously playing on postal property.

After carefully considering the entire testimony of Dr. Roessler and making its own observation of Harry on the stand, the court concludes that Harry, while certainly more functional than suggested by Dr. Roessler, is nonetheless learning disabled and that his decision making capabilities are below the capabilities of an average child of his age. While agreeing with defendant that Dr. Roessler may have dismissed favorable findings too quickly, there can be no dispute that many of Harry's test scores were below his age level. Thus, to the extent that some of the tests indicate that Harry was "average" in some areas, he also scored below average in other areas. Accordingly, the court gives appropriate weight to Dr. Roessler's opinion that Harry has cognitive difficulties which

---

**3.** Defendant argues that because Cole first said that he had not seen Louis and Ella Banks outside during the Summer of 1993 and then testified that he had, in fact, seen them outside renders his testimony unworthy of belief. While Cole may not have been clear as to seeing the Banks parents outside of the house, his testimony never wavered that he saw the children on postal property, that he saw Burch encourage the children to come onto postal property, and that he frequently saw the Banks boys riding the gate.

interfere with his ability to think logically. This was further noticeable from the court's observation of Harry, who testified at trial [4]. In brief is that the court finds that Harry, while basically "an able young man," suffers from learning disabilities which would cause confusion as to the proper manner to act when he was given conflicting directions.

All sides agree that on August 21, 1993, Harry Banks was injured on a large gate located on postal property, while the gate was being closed by Burch. There remains, however, significant disagreement as to the circumstances surrounding the accident. On the one hand, plaintiff argues that Harry was invited by Burch to ride the gate and was injured by the roller located on the top of the gate. Defendant maintains that Burch did not invite Harry to ride on the gate, but also chased him away. According to defendant, Harry returned unseen to the gate, injuring his hand on the bottom roller of the gate. For the following reasons the court finds that regardless of whether Burch invited Harry to ride the gate or not, he was aware that Harry was on the gate while Burch pushed it closed and that Harry's hand was unquestionably injured on the top of the gate.

The only witnesses to the actual accident were Harry, Oscar and Burch. In recalling the events, Burch testified that ten minutes before the accident, he partially closed the large Chambers Street gate, and then went inside the post office to lock the doors. At that time, Burch did not recall seeing either Harry or Oscar on postal property. When

Burch returned he began to close the gate at which point he observed Harry and Oscar "right at the entrance of the gate" (R. 151). According to Burch, when he saw the boys he told them to leave. He observed Harry and Oscar walk in an easterly direction toward Liberty Street and then Burch proceeded to close the gate.

Burch testified that it takes approximately eight seconds to close the gate. He testified that the last time he saw the boys, they were approximately ten to twelve feet away from the place where Burch was positioned. While he was closing the gate, Burch stated that he did not feel or hear anyone climb on the gate. The gate is heavy and Burch used his body as leverage to close the gate which operates on metal rollers. As Burch was proceeding he heard Harry scream "Steven, Steven, my fingers, my fingers" (R. 213–14). He immediately stopped closing the gate and saw Harry standing with his feet on the ground approximately eight feet away.

Harry and Oscar Banks offered a different version of the accident. Both Harry and Oscar testified that Burch called them over to postal property and told them that they could ride the gate. Both children testified that they had ridden on the gate several times before. The boys maintain that they climbed on the gate while it was being closed by Burch. While neither Harry nor Oscar recalled exactly where Harry had his hands at the time of the injury, both children stated that they were climbing on the fence at the time it happened. [5]

---

4. While accepting plaintiffs' contention that Harry suffered from learning disabilities which may have made it difficult for him to understand that he should not have been riding on the post office gate, this finding in no way suggests that Harry was not competent to testify. As previously stated, Harry clearly understood the difference between telling the truth and lying. Moreover, Harry indicated to the court, in the presence of counsel, that he would tell the truth when testifying. Notably, after the court conducted its inquiry, defense counsel offered no objection to Harry testifying.

5. Defendant contends that Harry injured his hand on one of the bottom rollers rather than the top roller. In support, defendant relies upon the testimony of Fred Sohr, a safety specialist with the United States Post Office. He testified that on August 23, 1993 he asked Oscar Banks

"where his brother got hurt" (R. 390), Sohr relayed that "he [Oscar] really didn't talk to me. He nodded his head in affirmance and then he pointed to the lower roller" (R. 390). Accordingly, Sohr concluded that the accident occurred at the lower roller. The court does not believe that the evidence supports that conclusion. Initially, at trial both Harry and Oscar stated that they were climbing the fence at the time of the accident. Moreover, it was clear from Sohr's description that Oscar merely nodded and pointed. He did not state Harry's fingers were injured on the lower roller, nor did he point specifically to a roller. According to Sohr, Oscar was five feet away from the fence when he pointed. Indeed, it may well have been that he did not understand the question or was merely pointing to the general area of the occurrence. Considering the specific testimony from Oscar that they were climbing on the fence and the nebulous description of

Resolving this dispute of fact, the court finds that Burch invited the boys to ride on the gate. The court comes to this conclusion, not solely based upon the testimony of Harry and Oscar, but after hearing all of the evidence which indicates Burch made a regular practice of inviting the boys onto postal property. As stated, Ingram and Cole both testified that they saw the boys with Burch on postal property. In point of fact, Cole saw Burch invite Harry and Oscar to ride the gate. The report of Deborah Mack indicates that she observed Harry Banks with Burch on postal property in late July 1993. According to Mack, when she asked what Harry was doing in the area, Burch replied "its alright—he's okay" (Joint Exh. 4). Mack wrote that she "told Steve that Harry doesn't belong in this area and that he must leave" (Joint Exh. 4). Thus, the overwhelming evidence indicates that Burch often allowed Harry onto postal property. Against this backdrop, the court finds the testimony of Harry and Oscar Banks, that Burch invited them to ride the gate, to be entirely credible.

Even if Burch did not actually invite Harry and Oscar to ride on the gate, the court finds it incredible that he was unaware of their presence at the time of the accident. According to Burch, after observing Harry and Oscar walk away, he began to close the gate. Common experience makes it unlikely that both Harry and Oscar, two children under ten years old at the time, could move with such stealth that an adult would not hear either of them. Even if the children approached the gate in silence, it is simply incredible that Burch did not feel any movement while Harry and Oscar climbed the chain–link fence. Accordingly, the court finds that Burch knew that Harry and Oscar were on the fence while he was closing it.

## CONCLUSIONS OF LAW[6]

■ This case involves claims of negligence against the United States and therefore, falls within the court's jurisdiction under the Federal Torts Claims Act 28 U.S.C. § 1346 (hereinafter "FTCA"). Under the

FTCA, the liability of the United States to a plaintiff for negligence is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *Molzof v. United States*, 502 U.S. 301, 305, 112 S.Ct. 711, 714–15, 116 L.Ed.2d 731 (1992). As instructed by the Supreme Court, this section of the FTCA requires a trial court to apply the whole law of the state in which the acts of alleged negligence occurred, *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 591–92, 7 L.Ed.2d 492 (1962); *Chen v. United States*, 854 F.2d 622, 626 (2d Cir.1988). Since the alleged negligence took place within the state of New York, the court will apply New York law in making its determinations.

■ Three questions are presented for consideration First, was Harry Banks injured as a result of the negligence of the United States? Second, if negligence is found, were plaintiffs comparatively negligent? Finally, whether Ella Banks' conduct constituted negligent supervision of Harry, thereby precluding her derivative claim of loss of services? For a plaintiff to establish a claim of negligence New York law requires a showing of "conduct below that of a reasonably prudent person under similar circumstances judged at the time of the conduct at issue." *Holland v. United States*, 918 F.Supp. 87, 89 (S.D.N.Y.1996).

### A.

■ Plaintiffs must demonstrate that defendant owed them a duty, that the duty was breached by defendant's negligence conduct, and that plaintiffs suffered injuries as a result of the breach. *Akins v. Glens Falls School District*, 53 N.Y.2d 325, 333, 441 N.Y.S.2d 644, 424 N.E.2d 531 (1981). In a situation such as the case at bar, "a landowner must act as a reasonable [person] in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risks." *Basso v. Miller*, 40

---

location provided by Sohr, the court finds that the accident occurred on the top roller.

**6.** Any conclusion contained within this section that also constitutes a factual determination should be deemed a finding of fact.

N.Y.2d 233, 241, 386 N.Y.S.2d 564, 352 N.E.2d 868 (1976); *see also, Kush v. City of Buffalo*, 59 N.Y.2d 26, 29, 462 N.Y.S.2d 831, 449 N.E.2d 725 (1983). Here, beyond peradventure of doubt, defendant breached its duty to plaintiff.

Burch, an employee of the post office, invited Harry and Oscar Banks onto postal property to ride the gate as he pushed it shut. By inviting the children to ride on the gate, Burch owed a reasonable duty of care to the plaintiff to watch that plaintiff was not injured while Burch was closing the gate. *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir.1995) (Applying New York law, the duty of a landowner is to take reasonable precautions to protect individuals from dangers which are foreseeable.). New York has long recognized "that it is considered foreseeable that children will enter upon premises to climb about and play." *Dart v. Solomon*, 210 A.D.2d 581, 583, 619 N.Y.S.2d 817 (3d Dept.1994), *quoting, Collentine v. City of New York*, 279 N.Y. 119, 125, 17 N.E.2d 792 (1938)[7]. Moreover, the evidence unequivocally demonstrates that Harry and Oscar Banks were no strangers to climbing the gate. Ingram and Cole each testified that they saw children, including the Banks boys, climbing the fences at the post office on numerous occasions. Harry and Oscar both testified that Burch had many times allowed them to ride on the gate while it was being closed. Accordingly, defendant breached the duty it owed to plaintiff.

■■ Even if the court were to accept defendant's contention that Burch did not invite the children onto the premises, liability would still attach to defendant. Initially it must be noted that New York has abolished the distinctions between invited and uninvited persons on property when establishing the duty owed to the person. *Basso*, 40 N.Y.2d at 241, 386 N.Y.S.2d 564, 352 N.E.2d 868. Rather, New York imposes a duty upon landowners to prevent the occurrence of foreseeable injuries, regardless of whether plaintiff is a trespasser, licensee or invitee.

It is undisputed that just before closing the gate Burch observed the children in the proximity of the gate. Burch's actions, considering his personal knowledge that Harry Banks was often on postal property and that Burch had at times encouraged Harry's presence, were unreasonable as he failed to ensure that the children were not on the gate while he closed it. Regardless of whether Burch invited Harry or where he thought Harry was going, it was reasonably foreseeable that Harry and Oscar would jump on the fence. Certainly the burden of turning one's head immediately before pushing the gate closed is not overly burdensome. Thus, whether or not Burch invited Harry to ride on the gate, he knew that Harry was on the gate while he pushed it closed. Pushing the gate closed while a child is climbing on it constitutes conduct below that of a reasonably prudent person.

In sum, it is clear that by inviting Harry onto postal property, Burch had a duty to reasonably protect Harry from injury. By allowing him to ride the gate while he closed it, Burch breached his duty and was the proximate cause of Harry's injuries[8]. Hence, plaintiff has established its case of negligence with respect to Harry Bank's injuries against defendant.

### B.

■■ Defendant asserts two arguments which it claims bar this court from imposing liability upon it. First, defendant contends that "there is no jurisdiction in this Court for a claim of negligence based on a failure to provide heightened measures to keep children off Post Office property." Defendant's Brief, p. 28. Specifically, defendant relies upon the discretionary function exception to the Federal Tort Claims Act. *See* 28 U.S.C.

---

[7]. Defendant contends that plaintiffs' case must fail because they have failed to demonstrate that defendant had notice that the roller was a hazard. Defendant's Brief, p. 24. This argument is irrelevant. At issue is not whether a dangerous condition existed upon postal property, but whether Burch's affirmative act of closing the gate while allowing Harry to climb upon it constituted negligence.

[8]. There is no dispute that Harry's injuries were caused by the roller on the gate when Burch was pushing it closed.

§ 2680(a)[9]. The Supreme Court has instructed that one of the purposes of the discretionary function exception to the FTCA was to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984). Indeed, defendant correctly points out that decisions by federal officials relating to security and safety features at Government facilities are discretionary acts for which no tort claim may lie. *See e.g., Fazi v. United States*, 935 F.2d 535, 539 (2d Cir.1991).

After careful consideration of defendant's argument, the court finds that the discretionary function exception is inapplicable to the case at bar. Plaintiffs' claims are not premised upon an argument that the Postal Service should have taken additional methods to ensure that children were not able to gain access to postal property. Rather, plaintiff maintains that it was the affirmative actions by defendant's employee Burch, in contravention ·of existing post office policy, which resulted in the tortious actions. It was Burch who invited Harry to climb on the gate, or at the very least, failed to make sure that Harry was not hanging onto the gate while it was being closed.

More, Burch's actions were in violation of an already existing policy at that postal location. Two supervisors testified that children are not permitted to play on post office property and Burch was specifically instructed that Harry Banks was not to be on postal property. Thus, plaintiffs' actions do not arise from claims that the post office should have done more to keep children off the property. Instead, plaintiff claims that Burch did not follow an existing policy. No discretionary act is implicated in connection with plaintiffs' claims, and therefore, the discretionary function doctrine does not bar plaintiffs' action. *See United States v. Gaubert*, 499 U.S. 315, 324, 111 S.Ct. 1267, 1274, 113 L.Ed.2d 335 (1991) ("If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy").

Defendant next argues that Harry Banks was comparatively negligent and assumed the risk of climbing on the gate. New York law provides that:

> In any action to recover damages for personal injury, injury to property, or wrongful death, the culpable conduct attributable to the claimant or to the decedent, including contributory negligence or assumption of the risk, shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused the damages.

C.P.L.R. § 1411. The purpose of this statute is to ensure that liability is apportioned according to the relative degrees of fault for the injury. *Kreppein v. Celotex Corp.*, 969 F.2d 1424, 1427 (2nd Cir.1992), citing, *Garrett v. Holiday Inns, Inc.*, 58 N.Y.2d 253, 258, 460 N.Y.S.2d 774, 447 N.E.2d 717 (1983). Under the facts of this case, the court finds that Harry Banks did not engage in any culpable conduct, nor under all of the circumstances did he assume any risk of injury.

It has long been settled in New York that "an infant is expected to exercise a level of care commensurate with his age, experience, intelligence and ability." *Republic Ins. Co. v. Michel*, 885 F.Supp. 426, 433 (E.D.N.Y.1995), citing, *Camardo v. New York State*, 247 N.Y. 111, 116, 159 N.E. 879 (1928). While the infant's age is one factor, the court "must also consider a child's intelligence, experience and ability to apprehend the existence of danger, take precautions against it and exercise any degree of care for his own safety." *Id.* Further, a plaintiff with diminished mental capacity may not be held to any greater degree of care for his own safety than that which he is capable of exercising. *Padula v. New York*, 48 N.Y.2d 366,

---

**9.** The section of the FTCA provides:

[a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a)

373, 422 N.Y.S.2d 943, 398 N.E.2d 548 (1979); *Smith v. Lebanon Valley Auto Racing Inc.*, 194 A.D.2d 946, 948, 598 N.Y.S.2d 858 (3d Dept.1993).

The court has previously determined that Harry was invited to ride the gate by Burch. An eight–year–old boy, who is told by an adult that he may ride on a gate while it is being closed, is likely to believe that it is "okay" to do so. While defendant correctly points out that at times Harry was told by his parents and other postal employees that he was not permitted to play on postal property, the record is replete with instances where Harry played on postal property where nothing was said or when Burch seemed to encourage such action. These mixed signals would be confusing to any child Harry's age. Moreover, while not adopting Dr. Roessler's conclusions in their entirety, the court does believe that Harry Banks suffers from some degree of learning disability and would likely become confused when given conflicting directions. Indeed, Ella Banks agreed that if Harry was told by an adult to refrain from certain conduct that he liked and another adult told him that he could proceed, he would engage in the activity he enjoyed. Consequently, the court finds that it was Burch's actions which led Harry to believe that he was permitted to ride the gate. Harry's conduct, therefore, was not comparably negligent.

Nor did Harry Banks assume any risk. In the context of assumption of risk, "a person must know and fully appreciate such risk." *Lebanon Valley*, 194 A.D.2d at 948, 598 N.Y.S.2d 858. Clearly Harry Banks had no idea that he could be seriously injured by the gate. To the extent that Harry was told not to play on post office property, there was nothing to indicate that he was in physical peril. He had been on postal property previously and even rode the gate in many instances. Even the supervisors who testified on behalf of defendant never stated that they had explained to Harry that he might get hurt playing on the gate. Of course, the gate itself was not inherently dangerous. Harry could only suffer the injury he did if the gate was being pushed closed. Harry had no reason to suspect that Burch would operate the gate in an unsafe manner. Finally, the fact that an adult, whose job it was to close the gates, told Harry that he could ride the gate would cause an eight–year–old boy in Harry's situation to believe that he was in no danger. Consequently, Harry did not assume the risk of riding the gate.

## C.

■ Defendant's last argument responds to Ella Banks' claim of loss of services as a result of Harry's injuries. According to defendant, because Ella Banks failed to properly supervise Harry at the time of the accident, she acted negligently and may not recover on her derivative claim. For the following reasons the court disagrees with defendant [10].

■ The rule in New York is that a defendant who negligently injures a child cannot avoid liability to the child by asserting a claim against the parent for negligent supervision of the child. N.Y. Gen. Oblig. Law § 3–111; *Holodook v. Spencer*, 36 N.Y.2d 35, 364 N.Y.S.2d 859, 324 N.E.2d 338 (1974). Thus, whether or not Ella Banks failed to adequately supervise Harry has no bearing on Harry's possibility of recovery. Nevertheless, the failure of a parent to act reasonably in the care of a child immediately prior to an accident may amount to contributory negligence barring a derivative recovery by the parent. *Albanese v. West Nassau Mental Health Center*, 208 A.D.2d 665, 617 N.Y.S.2d 821, 823 (2d Dept.1994) ("We note in this regard that any culpable conduct on the part of Vito Sr. would logically diminish the recovery upon his derivative claim, but would not have a similar effect on Vito Jr.'s personal injury claim."). The evidence in this case provides no substantiation to defendant's claim that Ella Banks acted improperly.

Defendant fails to adequately explain the negligence on the part of Ella Banks. Spe-

---

**10.** At this time the court does not pass judgment on the issue of whether Ella Banks sustained cognizable damages.

cifically, defendant concludes that Ella Banks should be precluded from pursuing her claim because she "simply failed to follow Harry or learn where he was going right before he had this unfortunate accident." Defendant's Brief; p. 40. In making this argument, defendant never articulates a standard by which Ella Banks' conduct can be measured. Certainly it is not incumbent upon a parent to know the exact location of their eight–year–old children at all times. Nor must a parent follow a child around the neighborhood every time the child plays. Defendant offers no alternative course of action Ella Banks should have taken.

The record shows that Ella Banks was not negligent in her supervision of Harry. She did not encourage or allow Harry to ride the gate. On the day of the accident, Harry was outside with Ella Banks and went to play. Ella Banks did not see where they went, did not know that Harry and Oscar were going to the post office, and had no reason to be concerned. Previously, Ella Banks had warned her children not to play on postal property and punished Harry when he did so. No reason existed for Ella Banks to suspect that Burch invited Harry to ride on the fence. She had never seen him do so and had no way of knowing that she should be on guard against such conduct by Burch. Children enjoy playing outside and suggesting that parents must know exactly where their children are at all times would be unreasonable. Accordingly, Ella Banks did not engage in negligent conduct.

### CONCLUSION

With regard to the issue of liability the court finds that defendant's conduct constituted negligence. Further, neither plaintiff was comparatively negligent, nor did Harry Banks assume the risks of climbing the fence. Defendant's request that the case be dismissed under the discretionary act doctrine is hereby denied.

Pursuant to the January 26, 1996 bifurcation order, plaintiffs and defendant are to contact the court within thirty (30) days of this decision to establish a schedule to proceed with the damages portion of this case.

**IT IS SO ORDERED.**